[Cite as *Panzica Constr. Co. v. Bridgeview Crossing, L.L.C.*, 2015-Ohio-3478.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102233**

## PANZICA CONSTRUCTION COMPANY, ET AL.

PLAINTIFFS-APPELLEES

vs.

## BRIDGEVIEW CROSSING, L.L.C., ET AL.

DEFENDANTS-APPELLEES

[Appeal By Garfield Hope Loan Acquisition, L.L.C.
Defendant-Appellant]

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-09-700759 and CV-09-709391

**BEFORE:** Stewart, J., E.A. Gallagher, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** August 27, 2015

**ATTORNEYS FOR APPELLANTS**

William Joseph Baker
Kerin Lyn Kaminski
Giffen & Kaminski, L.L.C.
1300 East Ninth Street, Suite 1600
Cleveland, OH 44114

Charles A. Nemer
Robert T. Glickman
Susan C. Stone
McCarthy, Lebit, Crystal & Liffman Co., L.P.A.
101 West Prospect Avenue, Suite 1800
Cleveland, OH 44115

**ATTORNEYS FOR APPELLEES**

**For Panzica Construction Company**

Melissa A. Jones
Andrew J. Natale
Mark Rodio
Frantz Ward L.L.P.
200 Public Square, Suite 3000
Cleveland, OH 44114

**For Bridgeview Crossing, et al.**

Gerald W. Phillips
Phillips & Company, L.P.A.
P.O. Box 269
Avon Lake, OH 44012

James L. Allen
Miller, Canfield, Paddock & Stone, P.L.C.
840 West Long Lake Road, Suite 200
Troy, MI 48098

Paul E. Perry
Miller, Canfield, Paddock & Stone, P.L.C.
511 Walnut Street, 19th Floor
Cincinnati, OH 45202

Sam P. Cannata
30799 Pinetree Road, Suite 254
Pepper Pike, OH 44124

Megan B. Odell
Simon P.L.C.
37000 Woodward Avenue, Suite 250
Bloomfield Hills, MI 48304

Also listed:

**For Aldi, Inc. Ohio**

Ralph E. Dill
James B. Harris
Harris, McClellan, Binau & Cox, P.L.L.
37 West Broad Street, Suite 950
Columbus, OH 43215

**For Doan Pyramid, L.L.C.**

Charles A. LoPresti
1144 Haverston Road
Lyndhurst, OH 44124

**For Kelly & Visconsi Associates, et al.**

Mark E. Owens
Grubb & Associates, L.P.A.
437 West Lafayette Road, Suite 260-A
Medina, OH 44256

**For State of Ohio**

Amy Keller Kaufman
Assistant Attorney General
Collections Enforcement Section

150 East Gay Street, 21st Floor
Columbus, OH 43215

**For Cuyahoga County Treasurer**

Timothy J. McGinty
Cuyahoga County Prosecutor

Anthony J. Giunta
Justice Center, 9th Floor
Cleveland, OH 44113

**For United States of America**

James R. Bennett
U.S. Attorney's Office
801 West Superior Avenue
400 United States Courthouse
Cleveland, OH 44113

**For Third Federal Savings and Loan Association of Cleveland**

Arthur J. Tassi
75 Public Square, Suite 1230
Cleveland, OH 44113

**For Liberty Bank, N.A.**

Jeffrey A. Brauer
Hahn, Loeser & Parks, L.L.P.
200 Public Square, Suite 2800
Cleveland, OH 44114

**Emerald Group Credit Union**
13201 Granger Road, Suite 1
Garfield Heights, OH 44125

**Garfield Heights City School District**
5640 Briarcliff Drive
Garfield Heights, OH 44125

**Shoe Carnival**

CT Corporation, Statutory Service Agent
1300 East Ninth Street, Suite 1010
Cleveland, OH 44113


MELODY J. STEWART, J.:

{¶1} Defendant-appellant Garfield Hope Loan Acquisition, L.L.C.[1] appeals from the denial of its motion for summary judgment and the grant of summary judgment in favor of plaintiff-appellee Panzica Construction Company in a lien priority dispute over premises collectively known as the Bridgeview Crossing Retail Shopping Center. For the reasons that follow, we reverse the grant of summary judgment in favor of Panzica, affirm the denial of Garfield Hope's motion for summary judgment, and remand to the trial court for further proceedings.

{¶2} In 2003, two developers, David B. Snider and Sam P. Cannata, sought to develop a commercial shopping mall on an area of land (hereinafter "the project") located on Transportation Boulevard in the city of Garfield Heights. To effectuate the building process, Snider and Cannata formed two business entities, Bridgeview Crossing, L.L.C. (hereinafter "Bridgeview") and Snider-Cannata Interests (hereinafter "SCI"). At all times relevant to this appeal, Bridgeview was the owner of the project property.[2]

---

[1] Garfield Hope Loan Acquisition, L.L.C. is a party to this action through its purchase of Huntington Bank's mortgage on Bridgeview Crossing's property.

[2] According to an affidavit for mechanic's lien filed by Panzica, Bridgeview is the title owner of the real property as well as any buildings, structures, utilities and improvements that comprised the project. The parties do not dispute this on appeal.

{¶3} On September 29, 2006, SCI entered into an contract with Panzica for construction management of the project. The contract identified SCI, not Bridgeview, as the owner of the project property. However, on October 2, 2008 the contract was amended by the parties to include Bridgeview as joint owner of the project with SCI.[3] The amendment states "this amendment is required to add Bridgeview Crossing, L.L.C. to the Contract since it was inadvertently omitted from the Contract form."

{¶4} Bridgeview entered into a construction loan agreement with Huntington National Bank, whereby Huntington agreed to loan Bridgeview $25 million to finance the project. The parties also entered into an agreement for a standby letter of credit in the amount of $5 million.[4] To secure the loans, Huntington and Bridgeview executed an open-end mortgage on the project property described in an exhibit (Exhibit A) attached to the mortgage agreement. Because the nature of the project required Bridgeview to later

---

[3] Although both Panzica and Garfield Hope admit on appeal that Bridgeview was at all relevant times the owner of the project property, the contract amendment states that Bridgeview and SCI are "joint owners" of the project. The amendment was signed by Sam P. Cannata, on behalf of Bridgeview Crossing, L.L.C. and Snider-Cannata Interests, L.L.C., in his capacity as "managing member" for both limited liability companies. The amendment also shows that a person with the initials SPC (presumably Sam P. Cannata) attempted to unilaterally change the amendment 12 days later. SPC crossed out the amendment that stated that Snider-Cannata was a joint owner, and wrote that Bridgeview was the owner of the project. SPC also crossed out Sam P. Cannata's signature as managing member of Snider-Cannata. The record further reflects that Panzica wrote to Sam P. Cannata, in his capacity as managing member for both Snider-Cannata and Bridgeview, stating that Panzica did not accept the unilateral changes that attempted to delete all references to Snider-Cannata in the agreed upon amendment to the contract. We further note that Panzica's affidavit for mechanic's lien and amended affidavit filed October 14, 2008, and December 12, 2008, respectively, state that Bridgeview is the owner of the project and that Snider-Cannata is the owner's agent.

[4] Subsequent modifications to the mortgage increased the line of available credit to $47 million.

acquire certain additional residential property near the parcel described in Exhibit A, the mortgage agreement also contained a clause stating that the parties agree that any future acquired property is to become part of the original mortgage.   The clause states:

> Borrower and Lender acknowledge and agree that Borrower will be acquiring additional property, including that property which may be in right-of-ways to be vacated * * * which will be part of the Project (as defined by the Loan Agreement) and that upon the acquisition of any such Additional Property, Borrower shall execute an amendment to this Instrument encumbering such Additional Property, which Additional Property will then be deemed as part of the "Property," secured by this Instrument.   Additional Property shall be subject to all of the terms, obligations and conditions set forth in this Mortgage.

Huntington recorded the mortgage on November 22, 2006.   On December 12, 2006, Panzica began its first visible work on the project.

{¶5} As planned, Bridgeview purchased additional parcels for the project.   In conjunction with these purchases, Bridgeview and Huntington executed several mortgage modifications. Huntington recorded the first modification on December 22, 2006, and the last on October 12, 2007.[5]   Each modification described the newly acquired parcels and each contained the following clauses:

---

[5] This time frame reflects only the mortgage modifications that added real property and are the subject of this dispute.

Borrower is acquiring certain additional real property ("Additional Property") which is part of the Property, as defined in the Loan Agreement, and which Borrower is obligated under the terms of the Loan Agreement to subject to the lien created by the Mortgage and other applicable Loan Documents.

\* \* \*

The real property described on Exhibit A to the Mortgage, Assignment and Indemnity Agreement is hereby amended to also include the Additional Property, as described on Exhibit A attached hereto and incorporated by reference herein.

\* \* \*

Except as amended and modified hereby, the provision of the Loan Documents remain in full force and effect and are binding upon and shall inure to the benefit of the parties hereto \* \* \*. Nothing in this Agreement shall affect or impair the liens or priority of the Loan Documents at their inception or the rights and remedies that Lender may have thereunder.

{¶6} Panzica was not paid for certain work done on the project, and on October 14, 2008, Panzica filed an affidavit for a mechanic's lien on the project. The affidavit stated that Panzica was owed $6,232,541.00 plus interest from the owner, Bridgeview, and its agent, SCI. The affidavit stated that Panzica began working on the project December 12, 2006, and finished on September 16, 2008. Later, Panzica filed a second affidavit for a mechanic's lien on the project, amending the amount to $9,138,868.00 plus interest and amended the last date of work to October 21, 2008.

{¶7} Bridgeview defaulted on its loan agreement with Huntington and Huntington won a judgment against Bridgeview in the amount of $29,348,397.05. Huntington also

obtained an additional judgment against Bridgeview for $6,457,621.00, plus interest, on a related loan. Huntingon filed its judgment liens and they continue to constitute valid and existing liens on the property.

{¶8} SCI also filed an affidavit of mechanic's lien against the project in the amount of $1,621,047.32. The lien affidavit averred that SCI conducted valuable work on the project for which it was not paid and that it commenced work on June 22, 2006, and concluded work on December 5, 2008.

{¶9} In August 2009, Panzica filed a complaint against Bridgeview and SCI seeking to foreclose on its mechanic's lien.[6] The complaint also brought claims for breach of contract, and unjust enrichment against SCI and Bridgeview, and asked for a declaratory judgment on the validity of its mechanic's lien and the invalidity of SCI's mechanic's lien.[7] Panzica named Huntington as a party defendant because of Huntington's judgment liens on the project property. Huntington answered the complaint asserting that its mortgage had priority over Panzica's lien. Huntington then

---

[6]A subcontractor, Independence Excavation, Inc., was also a party plaintiff to the lawsuit, but voluntarily dismissed its claims soon after the suit was filed. The complaint also named the following additional defendants as having a potential interest in the project property: Huntington National Bank, Shoe Carnival, Inc., Aldi, Inc. (Ohio), 96th Street Development, L.L.C., Kelly & Visconsi Associates, L.L.C., Doan Pyramid, L.L.C., Bridgeview Center South, L.L.C., Third Federal Savings and Loan Association of Cleveland, Garfield Heights Employees' Credit Union, Inc., Garfield Heights City School District, the State of Ohio, the United States of America, and James Rokakis, the Cuyahoga County Treasurer.

[7] The declaratory judgment also states at paragraph 93 that "Panzica is entitled to have Bridgeview Center South, L.L.C.'s mortgage lien declared a valid and subsisting lien against the Property as of April 17, 2009." It is unclear to us what or who Bridgeview Center South, L.L.C. is and how it is related to the parties involved in this case.

sought foreclosure on its mortgage. SCI filed a cross-claim against Bridgeview seeking to foreclose on its lien.

{¶10} On December 30, 2010, Garfield Hope purchased and acquired through assignment, Huntington's right, title, and interest in the loan, original mortgage, modifications, leases, and rents. Garfield Hope was later substituted for Huntington as the proper party in this action.

{¶11} Following discovery, Panzica filed a motion for summary judgment. In its motion, Panzica argued that, although its lien was second in priority to Garfield Hope's lien on the property described in Exhibit A attached to the original mortgage, its lien had priority over the liens on the property listed in the modifications because they were recorded after Panzica began work on the property.

{¶12} Garfield Hope opposed Panzica's motion and also filed a motion for summary judgment. Both the opposition and the motion asserted that it had priority over Panzica's mechanic's lien on the property in the modifications for four reasons: 1) the mortgage is an "open-end mortgage" and the modifications relate back to the date of the original mortgage; 2) the original mortgage was a construction mortgage and the modifications relate back to the date of the original mortgage; 3) Panzica failed to secure its priority by failing to file a notice of furnishing because it was not in privity of contract with Bridgeview, the project's owner; and 4) Panzica executed certain lien waivers that had the effect of forfeiting its rights against the property. Garfield Hope also argued that

because its mortgage and modifications have construction mortgage status, they have priority over SCI's mechanic's lien.

{¶13} Panzica filed a reply in support of its motion for summary judgment and opposed Garfield Hope's motion for summary judgment. In its reply/brief in opposition, it argued that it had no statutory obligation to issue a notice of furnishing because it was the original contractor on the project, and that it was in direct privity of contract with Bridgview through its agent, SCI. Panzica also argued that it had superior and first priority on the additional property added through the mortgage modifications because the modifications took effect as of the day they were recorded and could not relate back to the date of the original mortgage. Lastly, while Panzica admitted that it executed certain lien and claim waivers in connection with its work on the project, it argued that those waivers only released its claims for amounts already paid to it and were not full and final waivers for Panzica's complete work on the project.

{¶14} In its journal entry granting Panzica's motion for summary judgment and denying Garfield Hope's, the trial court adopted Panzica's argument that the mortgage modifications were junior to the mechanic's lien because they added significant real property and did not include a construction mortgage covenant. The court did not discuss any of the other arguments raised in the motions for summary judgment, including Garfield Hope's arguments regarding Panzica's failure to timely file a notice of furnishing and the execution of lien waivers.

{¶15} On appeal, Garfield Hope contends that the trial court erred in denying its motion for summary judgment for the following reasons: 1) that its mortgage lien was superior in priority because it arose from a construction mortgage as defined in R.C. 1311.14; 2) that its mortgage lien was superior in priority because it arose from an open-end mortgage as defined in R.C. 5301.232; 3) that its mortgage was entitled to superior priority because the modifications were specifically contemplated by the terms of the original mortgage and related back to the date of the mortgage; 4) that Panzica did not have superior priority because it executed lien waivers for all work performed prior to October 31, 2007; and 5) that Panzica failed to establish its priority because it failed to comply with the mechanic's lien statute that required it to file a notice of furnishing within 21 days of the recording of the notice of commencement.

Jurisdiction

{¶16} Before addressing the merits of the appeal, we note what initially appears to be a jurisdictional impediment to our review. *See Kohout v. Church of St. Rocco Corp.*, 8th Dist Cuyahoga No. 88969, 2008-Ohio-1819, ¶ 4 (explaining that although not raised by the parties, appellate courts must address the issue of jurisdiction when it appears uncertain).

{¶17} In Count 6 of its complaint, Panzica sought a declaratory judgment asking the court to declare SCI's mechanic's lien invalid, and to declare Panzica's mechanic's lien valid against the property in the amount $9,138,868.00, and that its lien be foreclosed. As previously noted, when the trial court ruled that the mortgage

modifications were junior to Panzica's mechanic's lien, the court did not address any other argument raised in the summary judgment motions. However, the ruling on both motions concluded by stating: "Panzica's motion for summary judgment is granted on all claims, counterclaims, and cross claims. Garfield Hope's motion for summary judgment is denied as to lien priority. No just reason for delay."

{¶18} This court has stated that "when a trial court enters a judgment in a declaratory judgment action, the order must declare all parties' rights and obligations in order to constitute a final, appealable order." *Stiggers v. Erie Ins. Group*, 8th Dist. Cuyahoga No. 85418, 2005-Ohio-3434, ¶ 5; *Klocker v. Zeiger*, 8th Dist. Cuyahoga No. 92044, 2009-Ohio-3102, ¶ 13.

> As a general rule, a trial court does not fulfill its function in a declaratory judgment action when it fails to construe the documents at issue. Hence the entry of a judgment in favor of one party or the other, without further explanation, is jurisdictionally insufficient; it does not qualify as a final order.

*Highlands Business Park, L.L.C. v. Grubb & Ellis Co.*, 8th Dist. Cuyahoga No. 85225, 2005-Ohio-3139, ¶ 23.

{¶19} Here, the trial court rendered a judgment in favor of Panzica without declaring whether Panzica's lien was valid and SCI's invalid. Therefore, on its face, the judgment appears to be jurisdictionally deficient. However, the court could not have rendered a judgment in favor of Panzica on all of its claims, counterclaims, and

cross-claims without having found that Panzica's lien was a valid lien against the property as sought in its declaratory judgment claim. Further, the court explicitly stated that *all* of Panzica's claims were granted. So even though the court did not specifically declare the parties' rights, we read the trial court's entry as granting Panzica's request to have its lien declared valid, and SCI's lien declared invalid. Accordingly, we find that the trial court's order is final and appealable. *See TCIF REO GCM, L.L.C. v. Natl. City Bank*, 8th Dist. Cuyahoga No. 92447, 2009-Ohio-4040, ¶ 12 (a judgment that determines priority of liens is a final appealable order).[8]

Validity of Panzica's Mechanic's Lien

**{¶20}** For ease of discussion, we begin our analysis by addressing Garfield Hope's argument that Panzica wholly and unconditionally waived its lien rights over the property contained in the mortgage modifications because the lien waiver argument goes straight to the validity of Panzica's mechanic's lien. Garfield Hope maintains that Panzica waived its priority over the mortgage modifications because it executed lien waivers for its work performed up to October 31, 2007. After reviewing the lien waivers in their entirety, we find that there remains a genuine issue of material fact as to whether Panzica did in fact unconditionally waive its lien rights.

---

[8] We note, however, that a court must first determine the validity of a lien before determining its priority, otherwise the order is interlocutory. *See Goodman v. Schneider*, 8th Dist. Cuyahoga No. 96883, 2012-Ohio-5411, ¶ 23 (dismissing appeal for lack of a final appealable order where the trial court explicitly reserves ruling on lien validity after determining lien priority).

**{¶21}** Panzica executed 12 different lien waivers between the dates of January 9, 2007, and October 31, 2007. All lien waivers were signed by a duly authorized agent of Panzica and notarized. Garfield Hope claims that each and every lien waiver states:

> [Panzica] * * * does hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the state of Ohio relating to mechanic's liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the monies, funds or other considerations due or to become due from the owner, on account of labor, services, material, fixtures, apparatus or machinery heretofore furnished, or which may be furnished at any time hereafter, by the undersigned for the above-described premises.

Thus, according to Garfield Hope, the plain language of the statement establishes that Panzica waived its lien rights to all payments due or to become due from the owner for its work on the project.

**{¶22}** A review of the 12 waivers shows that only one waiver contains the above statement — the waiver dated February 20, 2007. That waiver is on blank letterhead and contains the conspicuous wording "partial lien waiver" at the top of the document. It also contains a payment amount of $236,333.70, stated as consideration for the waiver. The waiver further acknowledges receipt of payment.

**{¶23}** All of the other lien waivers, with the exception of two dated April 3, 2007, and April 11, 2007, do not contain the above language but rather provide:

> [T]he undersigned [Panzica] does waive and release any and all claims and lien rights for and in connection with the above described project for said labor performed and materials furnished.

These waivers are on Panzica letterhead and do not indicate an amount of money received as consideration for the waiver, but rather each states a different amount of money that is the "balance due and owing" for all labor performed and materials furnished.

{¶24} The two waivers dated April 3, 2007, and April 11, 2007, similar to the waiver dated February 20, 2007, are also on blank letterhead. Each waiver conspicuously states at the top that it is an "unconditional, partial waiver of mechanic's lien," and that it is a "progress payment."

{¶25} The April 3 waiver states:

[Panzica], in consideration of the sum of <u>$100,283.40 </u>the receipt of which is hereby acknowledged, subject to the reservations contained herein below, does hereby waive, release and relinquish any and all liens and claims for liens for <u>labor or work performed and/or materials furnished</u> to Bridgeview Crossing for premises located at Bridgeview Crossing at the Northwest quadrant of I-480 and Transportation Boulevard through the <u>28th</u> day of <u>March</u>, 2007.

Additionally, nothing in this Partial Waiver of Mechanic's Lien shall in any way affect the priority of any lien filed after the date hereof. Further, [Panzica] specifically reserves all lien rights for <u>labor or work performed and/or material furnished</u> after the <u>25th</u> day of <u>March</u>, 2007 on or to the above referenced project.

{¶26} The April 11 waiver states:

[Panzica], in consideration of the sum of <u>$17,730.00</u> the receipt of which is hereby acknowledged, subject to the reservations contained herein below, does hereby waive, release and relinquish any and all liens and claims for liens for <u>labor or work performed and/or materials furnished</u> to Bridgeview Crossing for premises located at Bridgeview Crossing at the Northwest quadrant of I-480 and Transportation Boulevard through April 11, 2007.

Additionally, nothing in this Partial Waiver of Mechanic's Lien shall in any way affect the priority of any lien filed after the date hereof. Further, [Panzica] specifically reserves all lien rights for <u>labor or work performed and/or material furnished</u> after the [sic] April 11, 2007 on or to the above referenced project.

**{¶27}** The February 20, 2007 lien waiver appears to be a full waiver of claims to work done on the property because it states that Panzica is waiving all claims to mechanic's liens on the property for work previously furnished or to become furnished in the future, in consideration of a sum it acknowledges was received. However, we find that other language contained in the waiver creates ambiguity as to the parties' intent. While the body of the waiver purports to be an unconditional and total waiver of liens, the conspicuous language at the top of the form indicates that it is a "partial lien" waiver. When contracts are entered into between parties of equal bargaining power and are ambiguous in their interpretation, any ambiguity is construed in favor of the nondrafting party against the drafter. *Safeco Ins. Co. of Am. v. White*, 122 Ohio St.3d 562, 2009-Ohio-3718, 913 N.E.2d 426, ¶ 18. In this case, the record on appeal is inconclusive as to who drafted this particular waiver because it is transcribed on blank letterhead.[9]

---

[9] Panzica claims in its reply in support of its motion for summary judgment and opposition to Garfield Hope's motion for summary judgment that it was Garfield Hope's predecessor in interest, Huntington, that drafted the waivers. This claim remains largely unsupported by any evidence in the record beyond Panzica's conclusory statements. Moreover, the deposition of William J. Davis, vice president and senior project manager for Panzica, undermines the claim that *all* waivers were drafted by Huntington. Davis testified that Panzica issued its standard lien waiver form with every payment

Therefore, there remains a genuine issue of material fact as to whether this waiver represents a partial waiver of the amount indicated as consideration therein.

{¶28} We do not find any ambiguity in the April 3, 2007 and April 11, 2007 waivers however. The language contained in the body of the waivers comports with the plain language at the top of each document which states that each is an unconditional, partial lien waiver on the property. The language of the waiver states that payment has been received in consideration of waiver of all claims to the property up to their respective specified dates of March 28, 2007, and April 11, 2007. Therefore, we find that Panzica waived its lien claims against the project property for all amounts owed to it for work performed prior to April 11, 2007.

{¶29} Notwithstanding our determination that Panzica waived its lien rights over the amounts that may have remained unpaid to it for work done before April 11, 2007, we find that its priority date of December 12, 2006, (the first date of visible work on the project) for subsequently filed mechanic's liens, remains intact. The waiver specifically states that nothing in the document should be construed to affect the priority date of any subsequently filed mechanic's lien. The mechanic's lien statute states that regardless of when work was performed, a lien against the property takes effect for priority purposes as

application. Tr. 232–233. However, when questioned about defense Exhibit 33C, which is the unconditional, partial lien waiver executed on April 11, 2007, Davis stated, "I believe this is a waiver provided by the bank." Tr.237. Thus, from Davis' deposition we are able to infer that some of the waivers were drafted by Panzica, while others were drafted by additional parties, which might include Huntington. On this limited evidence however, we cannot draw any conclusions as to who drafted the February 20, 2007 waiver.

of the first date of visible work on the project. R.C. 1311.13(A)(1). Therefore, upon remand, the court must consider how the partial waivers affect, if at all, the unpaid amount stated in Panzica's affidavit for mechanic's lien, and whether the unpaid balance is an accurate reflection of the amount owed on lienable work.[10]

{¶30} As for the remainder of the lien waivers, we find that these were drafted by Panzica because they appear on Panzica letterhead. We also find that the language of the waiver only waives its claims to work performed for the amount of money specified as due and owing therein. We believe that this is the only reasonable conclusion that can be made considering that the lien waivers state that Panzica is waiving its rights in connection with "*said* labor performed and materials furnished" (emphasis added), and are accompanied by a detailed application for payment that provides the amount of the current payment due, and the balance of payment owed. Thus, we find that the ordinary meaning of the words contained in the instrument establish that the documents were lien waivers over the amounts indicated therein and not total and unconditional lien waivers. *See M&T Elec. Co. v. LLLJ, Ltd.*, 8th Dist. Cuyahoga No. 99479, 2014-Ohio-5678, ¶ 31 (explaining that, "in general, common words appearing in a written instrument will be given their ordinary meaning unless a manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument").

_____

[10] We note that although the trial court stated in its journal entry that Bridgeview admits that Panzica is undisputably owed $9,138,868.00 — the amount stated in the affidavit for mechanic's lien filed by Panzica — Garfield Hope has always disputed the accuracy of this amount on the grounds it includes nonlienable work.

Therefore, upon remand, the court must also determine how these waivers affect, if at all, the amount claimed in the affidavit for mechanic's lien.

## Notice of Furnishing

{¶31} Garfield Hope also argues that Panzica is not entitled to priority over the mortgage modifications that were made subsequent to the filing of the notice of commencement because Panzica was obligated to record a notice of furnishing within 21 days of Bridgeview's recording of the notice of commencement. While Panzica did file a notice of furnishing, it did not do so until over a year after the recording of the notice of commencement.

{¶32} In Ohio, owners who contract for improvements to their real property that may give rise to a mechanic's lien, must file a notice of commencement with the county recorder in which the real property is located. The notice of commencement should be filed prior to any performance of labor, or work, or furnishing of materials, for the purpose of the improvement. R.C. 1311.04(A). The purpose of a notice of commencement is to provide potential mechanic's lien claimants with sufficient information with which to assert their lien rights, and to establish relative priority. *Arts Rental Equip. v. Bear Creek Constr.*, *L.L.C.*, Hamilton C.P. No. A0902785, 2011 Ohio Misc. LEXIS 437, *18 (Aug. 10, 2011), citing *Clinton Elec. & Plumbing Supply, Inc. v. Airline Professionals Assn.*, *Teamsters Local 1224*, 12th Dist. Clinton No. CA2005-08-016, 2006-Ohio-1274, ¶ 11; *Accord Linworth Lumber Co. v. Z.L.H., Ltd.*, 126 Ohio Misc.2d 56, 2003-Ohio-7322, 802 N.E.2d 736, ¶ 18 (C.P.), (stating, that the

"overriding purpose" of the notice of commencement is "to put subcontractors or materialmen on notice of who the owner is and where the construction work is to be done."). Thus, the notice of commencement is less important for original contractors and those entities in privity of contract with the owner of the premises, because they presumably are aware of all of the relevant information necessary to assert their lien rights.

{¶33} With the filing of the notice of commencement comes the concomitant requirement that subcontractors and material suppliers file a notice of furnishing in order to preserve their lien rights. *See* R.C. 1311.05. The purpose of the notice of furnishing is to avoid surprise liens to the project owner who might not otherwise be aware of a subcontractors work on the project. *See Linworth Lumber Co. v. Z.L.H., Ltd.*, 126 Ohio Misc.2d 56, 2003-Ohio-7322, 802 N.E.2d 736, ¶ 16 (C.P.). It follows that this requirement does not apply to construction managers, or those entities otherwise in privity of contract with the owner of the project, because the owner is presumably aware of those entities with which it has entered into a contractual agreement. *See id.*

{¶34} If an owner does not record a notice of commencement prior to the start of work, then the original contractor may request, in writing, that the owner record a notice of commencement and serve it on all of the various contractors and subcontractors. R.C. 1311.04(M)(1). If the owner fails to record a notice of commencement, or if a notice of commencement is recorded but is materially deficient in some way, then a subcontractor is not required to issue a notice of furnishing to preserve its lien rights. R.C. 1311.04(R).

In the event that an owner does record a notice of commencement but does so after the first work, labor, or material has been performed on, or furnished to, the improvement, then subcontractors and material suppliers have 21 days after the notice of commencement to file a notice of furnishing in order to perfect their liens, and they need not serve a notice of furnishing to preserve lien rights for the period before the notice of commencement is recorded.   R.C. 1311.04(I).

{¶35} Here, Garfield Hope's argument that Panzica was required to timely record a notice of furnishing relies exclusively on the assumption that Panzica was a subcontractor, and not an original contractor and construction manager, to the project. R.C. 1311.01 provides the following definitions:

> (D) "Subcontractor" includes any person who undertakes to construct, alter, erect, improve, repair, demolish, remove, dig, or drill any part of any improvement under a contract with any person other than the owner, part owner, or lessee.
>
> (E) "Original contractor," except as otherwise provided in section 1311.011 of the Revised Code, includes a construction manager and any person who undertakes to construct, alter, erect, improve, repair, demolish, remove, dig, or drill any part of any improvement under a contract with an owner, part owner, or lessee.
>
> (F) "Construction manager" means a person with substantial discretion and authority to manage or direct an improvement, provided that the person is in direct privity of contract with the owner, part owner, or lessee of the improvement.

{¶36} For purposes of our analysis, the relevant difference between original contractors, construction managers, and subcontractors, is that original contractors and construction managers have contracted with the owner, part owner, or lessee of the

project directly. Original contractors and construction managers are not required to take any further action prior to filing a mechanic's lien affidavit in order to perfect their liens. On the other hand, R.C. 1311.05(A) places an additional mandatory duty on subcontractors to record a notice of furnishing within 21 days of the recording of a notice of commencement to preserve lien rights.

{¶37} In this case, Bridgeview filed the notice of commencement on October 3, 2007, at what appears to be the explicit request of Panzica.[11] Panzica filed a notice of furnishing on October 10, 2008.[12] Garfield Hope argues that Panzica was not in privity of contract with Bridgeview because SCI, not Bridgeview, was named as the owner of the project in the contract dated September 29, 2006, which established that Panzica would provide contract management for the project.

{¶38} Although it is true that the original contract names SCI as the owner of the project, we nevertheless find that Bridgeview was a party to the contract from its inception. First, the original contract identifies Bridgeview's address, 5595 Transportation Bouvlevard, as the owner's address. The contract also provides the correct name and location of the project and its premises, which Bridgeview owns. Further, the affidavit testimony of Sam P. Cannata establishes that SCI, Bridgeview, and

---

[11] On June 6, 2007, Panzica wrote to SCI requesting that the owner supply it with a copy of the notice of commencement, or if a notice of commencement had not yet been recorded, to record a notice of commencement and thereafter supply it with a copy.

[12] Although Panzica maintains that as an original contractor and contract manager on the project it was not required to file a notice of furnishing, Panzica does not explain why it nevertheless filed one.

Panzica all intended that Bridgeview be bound by the agreement, and that SCI was acting as an agent on behalf of Bridgeview when it entered into the contract with Panzica. *See* R.C. 1311.10(A) (stating that "[a]ny person who contracts for an improvement to real property which gives rise to lien rights under sections 1311.01 to 1311.22 of the Revised Code is presumed to be the authorized agent of all part owners of the real property * * *."). Lastly, the contract was amended on October 2, 2008, to include Bridgeview as a joint owner of the project with SCI.

{¶39} Moreover, proof of Bridgeview's understanding that it was bound by the contract is evidenced in the notice of commencement that was recorded more than a year before the contract was amended. The notice of commencement states that Bridgeview is the contracting party and the owner of the premises, and that Panzica was the original contractor and construction manager of the project. The notice of commencement was prepared by Sam P. Cannata as a member of Bridgeview.

{¶40} Because Panzica, SCI, and Bridgeview all agree that Bridgeview was the owner of the property, that Bridgeview at all times knew that Panzica was the contract manager of the project, and the contract between the parties was later amended to reflect Bridgeview's ownership status, Panzica was not required to record a notice of furnishing. Our resolution of this issue is informed by the purpose the notice of commencement and the notice of furnishing serves — to give subcontractors the relevant information they need to file liens against the property and to protect owners from surprise liens against the

premises.   As neither of those concerns apply to this case, Panzica's lien rights do not fail for failure to file a timely notice of furnishing.

## Priority of Liens

{¶41} Garfield Hope next argues that its mortgage lien has first priority over all other liens on the property described in Exhibit A attached to the original mortgage as well as the property described in the mortgage modifications because the original mortgage was a construction mortgage and an open-end mortgage and the priority date of the modifications relate back to the recording date of the original mortgage.   Further, Garfield Hope argues that its lien has first priority on the property in the mortgage modifications because the original mortgage put potential lien holders on notice that additional property would be added to the security through modification, and the modifications incorporate the necessary covenant language of R.C. 1311.14 by reference to the original mortgage.

{¶42} In general, a mechanic's lien that is filed after the recording of a mortgage for work done before a mortgage is filed has priority over the mortgage.   R.C. 1311.13. However, Ohio's construction mortgage statute, R.C. 1311.14, gives mortgages that are in compliance with the statute "super-priority" over mechanic's liens that are filed after the recording of the mortgage, but have an effective date prior to the recording of the mortgage.   Hence, the defining characteristic of a construction mortgage is that it is awarded priority over mechanics liens that are filed after the recording of a mortgage, regardless of when those liens may take effect.   R.C. 1311.14 states in relevant part:

Except as provided in this section, the lien of mortgage given in whole or in part to improve real estate, or to pay off prior encumbrances thereon, or both, the proceeds of which are actually used in the improvement in the manner contemplated in sections 1311.02 and 1311.03 of the Revised Code, or to pay off prior encumbrances, or both, *and which mortgage contains therein the correct name and address of the mortgagee, together with a covenant between the mortgagor and mortgagee authorizing the mortgagee to do all things provided to be done by the mortgagee under this section*, shall be prior to all mechanic's, materialmen's and similar liens and all liens provided for in this chapter that are filed for record after the improvement mortgage is filed for record, to the extent that the proceeds thereof are used and applied for the purposes of and pursuant to this section. Such mortgage is a lien on the premises therein described from the time it is filed for record for the full amount that is ultimately and actually paid out under the mortgage, regardless of the time when the money secured thereby is advanced.

(Emphasis added.)

{¶43} Therefore, in order to have a valid construction mortgage the mortgagee must ensure that the mortgage is given to improve real estate or pay off prior encumbrances, the mortgage contains the correct name and address of the mortgagee, that the mortgage contains a covenant between the mortgagor and mortgagee authorizing the mortgagee to do all things provided to be done under the construction mortgage statute, and that the proceeds of the loan were used and applied pursuant to the construction mortgage statute.

{¶44} Further, Ohio's open-end mortgage statute, R.C. 5301.232 states in relevant part:

(A) Whether or not it secures any other debt or obligation, a mortgage may secure unpaid balances of loan advances made after the mortgage is delivered to the recorder for record, to the extent that the total unpaid loan indebtedness, exclusive of interest thereon, does not exceed the maximum amount of loan indebtedness which the mortgage states may be outstanding

at any time. With respect to such unpaid balances, division (B) of this section is applicable if the mortgage states, in substance or effect, that the parties thereto intend that the mortgage shall secure the same, the maximum amount of unpaid loan indebtedness, exclusive of interest thereon, which may be outstanding at anytime, and contains at the beginning thereof the words "Open-end mortgage."

(B) A mortgage complying with division (A) of this section and securing unpaid balances of loan advances referred to in such division is a lien on the premises described therein from the time such mortgage is delivered to the recorder for record for the full amount of the total unpaid loan indebtedness, including the unpaid balances of such advances that are made under such mortgage, plus interest thereon, regardless of the time when such advances are made. If such an advance is made after the holder of the mortgage receives written notice of a lien or encumbrance on the mortgaged premises which is subordinate to the lien of the mortgage, and if such holder is not obligated to make such advance at the time such notice is received, then the lien of the mortgage for the unpaid balance of the advance so made is subordinate to such lien or encumbrance. If an advance is made after the holder of the mortgage receives written notice of work or labor performed or to be performed or machinery, material, or fuel furnished or to be furnished for the construction, alteration, repair, improvement, enhancement, or embellishment of any part of the mortgaged premises and if such holder is not obligated to make such advance at the time such notice is received, then the lien of the mortgage for the unpaid balance of the advance so made is subordinate to a valid mechanic's lien for the work or labor actually performed or machinery, material, or fuel actually furnished as specified in such notice.

Thus, the hallmark of an open-end mortgage is it allows a borrower to go back to the lender to borrow additional funds, up to, and including, a specified amount that is usually set forth in the loan documentation. Those funds are secured by the collateral stated in the loan and mortgage documents.

**{¶45}** Panzica admits that the original mortgage filed on November, 22, 2006, was both a construction mortgage under R.C. 1311.14,[13] and an open-end mortgage under R.C. 5301.232 because it met the requirements of both statutes. Therefore, Panzica does not dispute that Garfield Hope's lien has first priority on the property described in Exhibit A of the original mortgage. Panzica does contend, however, that Garfield Hope's mortgage lien does not have first priority on the land described in the mortgage modifications because the modifications do not contain the required R.C. 1311.14 covenant, and thus are not construction mortgages in their own right. Panzica also contends that the modifications do not relate back to the filing of the original mortgage because amendments and modifications take effect on the date they are filed with the recorder. Panzica maintains that the only way the modifications could have priority over its mechanic's lien is if they included the required construction mortgage covenant in each modification.

Relation Back of Mortgage Modifications

**{¶46}** The first question we consider is whether the modifications relate back to November 22, 2006, the filing date of the original mortgage. We find that they do not.[14]

---

[13] The necessary covenant language is found at section 30 of the original mortgage entitled PRIORITY OF MORTGAGE LIEN. It states, "Lender, at Lender's option, is authorized and empowered to do all things provided to be done by a mortgagee under Section 1311.14 of the Revised Code of Ohio, and any present or future amendments or supplements thereto, for the protection of Lender's interest in the premises."

[14] Garfield Hope seems to argue that the mortgage modifications relate back simply by virtue of the original mortgage's construction mortgage status and open-end mortgage status. We can find no legal support for this argument. The

**{¶47}** R.C. 5301.231 states in relevant part that, "[a]ll amendments or supplements of mortgages, or modifications or extensions of mortgages * * * shall take effect at the time that they are delivered to the recorder for record." The mortgage modifications at issue in this case were recorded on the following dates:[15]

---

construction mortgage statute, R.C. 1311.14, and the open-end mortgage statute, R.C. 5301.232, say nothing about relation back for later acquired parcels. And although we acknowledge that an open-end mortgage may give lenders first priority for the money paid out in the loan disbursements, at least one court has found that it does not allow lenders to secure additional collateral through mortgage modification. *See Efficient Air Inc. v. Qualstan Corp. (In re Qualstan Corp.),* 302 B.R. 575, 579–582 (Bankr.S.D.Ohio 2003).

[15] We note from the record that these are the modifications that purport to add real property to the original mortgage. However there is some discrepancy between the parties regarding which modifications they believe to be the subject of this appeal. Garfield Hope states in its brief that the subject properties are those contained in modifications 1, 2, 3, 4, 5, 6, 7, 9, *11,* and 12. Our review of modification 11, recorded on September 24, 2007, appears to simply grant an extension of certain due dates in the loan documents and modified other portions of the loan documents, but did not purport to add any real property to the mortgage. Panzica's brief does not state that the eleventh loan modification added real property, rather it states that modifications 1, 2, 3, 4, 5, 6, 7, 9, 12, and *14* added real property. Our review of the fourteenth loan modification establishes that it replatted property but did not add additional property to the mortgage. We note also that there are various discrepancies over which modifications are at issue in both parties' motions for summary judgment, as well. Therefore on remand, the trial court must resolve these discrepancies and determine which modifications are the subject of this dispute.

| Modification Number | Date Recorded |
|---|---|
| 1 | 12/22/06 |
| 2 | 01/11/07 |
| 3 | 01/19/07 |
| 4 | 02/26/07 |
| 5 | 03/07/07 |
| 6 | 03/16/07 |
| 7 | 05/31/07 |
| 9 | 08/22/07 |
| 12 | 10/12/07 |

**{¶48}** While the statute does not define the phrase "shall take effect," we conclude, based on our review of other similar statutes, that it means an amendment or a modification is invalid as against other creditors until recorded and its priority is determined as of the date of recording, not the date of the original mortgage.

**{¶49}** Our conclusion on this issue is informed by a careful reading of R.C. 5301.23 and 1311.13. R.C. 5301.23(A) states:

> (A) All properly executed mortgages shall be recorded in the office of the county recorder of the county in which the mortgaged premises are situated and shall take effect at the time they are delivered to the recorder for record. If two or more mortgages pertaining to the same premises are presented for record on the same day, they shall take effect in the order of their presentation. The first mortgage presented shall be the first recorded, and the first mortgage recorded shall have preference.

**{¶50}** According to the above statute, the phrase "shall take effect" means that a mortgage is not valid as against other mortgages until recorded and that priority attaches as of the time of recording.

**{¶51}** Likewise, an analysis of R.C. 1311.13(A)(1) leads us to the same conclusion. Under this statute, regardless of when a mechanics lien is filed, it is "effective" as against subsequently filed mortgages as of the first date that visible work or labor is performed or materials are furnished on the premises. *Id.* In enacting this statute, the General Assembly chose to make the effective date of a mechanic's lien the date of visible work, presumably because visible work puts the world on notice of a potential mechanic's lien. *See Wayne Bldg. & Loan Co. v. Yarborough*, 11 Ohio St.2d 195, 219, 228 N.E.2d 841 (1967). However, regardless of its reasons, it is clear from the statute that the General Assembly was explicit in its desire that the effective date of mechanic's liens relate back to the date of first visible work. We believe the General Assembly likewise evidenced its desire that mortgage modifications not relate back to the date of the original mortgage by stating that amendments and modifications are effective as of their recording date.[16] Accordingly, we find that the mortgage modifications do not relate back to the same priority date as the original mortgage.

---

[16] On this issue, Garfield Hope urges us to adopt the Restatement of Property (Third), Mortgages, § 7.3, which relates to the replacement and modification of senior mortgages and the effect on intervening interests. In summary, this section states that if a senior mortgage, or the obligation it secures, is modified by the parties, the mortgage as modified retains priority against junior interests, unless the modifications are materially prejudicial. The section further states that even if the mortgage modification is materially prejudicial, it will retain priority over the

Super Priority Under R.C. 1311.14

**{¶52}** Panzica asserts that Garfield Hope's mortgage modifications do not have super priority under R.C. 1311.14 stating that, "[h]ad Garfield Hope desired that each amendment be provided with 'super priority,' it simply needed to include the Ohio Rev. Code §1311.14 covenant in each Mortgage Amendment." We conclude however that the mortgage modifications do contain the required R.C. 1311.14 covenant by reference to the original mortgage and have priority over Panzica's mechanic's lien, if Garfield Hope is able to establish that it paid out the loan proceeds in accordance with the statute.

**{¶53}** The purpose of the R.C. 1311.14 covenant is to put potential lien holders on notice that certain parties have executed a construction mortgage. *See Ford Homes, Inc. v. Bobie*, 12th Dist. Butler No. CA2008-09-220, 2009-Ohio-677, ¶ 29. In this case, the mortgage modifications had the effect of putting Panzica and all other mechanic's lien holders on notice of its construction mortgage status by incorporating by reference the R.C. 1311.14 covenant from the original mortgage. Each modification that encumbered additional real property reaffirms that: "the provisions of the Loan Documents [(original mortgage and note)] remain in full force and effect and are binding upon and shall inure

---

junior lien if the senior mortgage contains a reservation clause that gives the parties the right to modify the mortgage. Although the Restatement, Section 7.3 is directly on point with the issues in this case, the restatement is only persuasive authority and is not legally binding on this court. *See Monahan v. Belmont Cty. Agricultural Soc.*, 7th Dist. Belmont No. 97-BA-23, 1998 Ohio App. LEXIS 3259, *20–21 (July 15, 1998). Garfield Hope is unable to point this court to any case in which this district or another Ohio court has followed the restatement in lien priority disputes. Indeed, we question whether the Ohio legislature's language in R.C. 5301.231 may have been an outward rejection of the restatement's analysis on

to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns." It is uncontested that the original mortgage contained the required covenant and the quote above makes clear that the modifications are incorporating the provisions of the original mortgage, which includes the R.C. 1311.14 covenant language.

{¶54} Furthermore, each modification stated the correct name and address of the mortgagee and mortgagor, and referred to the record instrument number of the original mortgage and any prior modifications. Thus, a bit of due diligence on the part of Panzica, or any other lien holder, would have revealed the construction mortgage status of the latter security instruments. Notably, Panzica does not attempt to claim that it did not have notice of Huntington's intent to encumber future property through use of the construction mortgage statute. Rather, Panzica argues that Huntington did not succeed in creating valid construction mortgages because it failed to include, word for word, a recitation of the required statutory covenant.

{¶55} We believe that our holding comports with both the spirit and letter of the law, because there can be no argument that incorporation by reference put Panzica on notice of each modification's construction mortgage status, and it is a general principle of Ohio contract law that separate agreements may be incorporated by reference into a signed contract and that when done, both instruments must be read and construed together. *Key Bank Natl. Assn. v. Columbus Campus, L.L.C.*, 10th Dist. Franklin Nos.

this point of law.

11AP-920, 11AP-952, 11AP-955, 11AP-958, 11AP-959, 11AP-963, 11AP-964, 2013-Ohio-1243, ¶ 24. Furthermore, the last paragraph of R.C. 1311.14 specifically states:

> This section, as to mortgages contemplated by this section, controls over all other sections of the Revised Code relating to mechanic's, material supplier's, contractor's, subcontractor's, laborer's, and all liens that can be had under this chapter, and *shall be liberally construed in favor of such mortgagees, a substantial compliance by such mortgagees being sufficient.*

(Emphasis added.) *Accord Barr v. Masterpiece Homes*, 8th Dist. Cuyahoga No. 65835, 1994 Ohio App. LEXIS 3211, *8 (July 21, 1994) (stating, "[w]here a mortgagee substantially adheres to the provisions of R.C. 1311.14, it serves to negate R.C. 1311.13, and give priority to an after-recorded mortgagee."). Because construction mortgages are to be liberally construed in favor of the mortgagee and because Huntington took steps to incorporate the R.C. 1311.14 covenant language into its modifications, we find that Huntington substantially complied with the requirements of the statute.

{¶56} We do agree, however, that Panzica has created a genuine issue of material fact as to whether the loan disbursements were paid out in accordance with R.C. 1311.14, the fourth requirement of a construction mortgage. Panzica argues that Garfield Hope has failed to prove that it distributed the loan proceeds in accordance with R.C. 1311.14 because it did not present evidentiary quality materials establishing this fact and therefore summary judgment was properly denied.

{¶57} R.C. 1311.14(B) contains the ways in which a construction loan disbursement must be paid out in order to retain its "super priority." This section states:

(B) The mortgagee need not pay out any of the mortgage fund for fifteen days after filing the mortgage. At the end of such period, the mortgagee may refuse to go forward with the loan or to pay out the fund, in which case, if no funds have been advanced, the mortgagee shall make, execute, and deliver to the mortgagor, or to the county recorder to be recorded, a proper release of the mortgage, but if the mortgagee elects to complete the loan, the mortgagee shall, in order to obtain the priority set forth in this section, distribute the mortgage fund in the following order:

(1) The mortgagee may at any time pay off the prior encumbrance, or withhold the amount thereof for that purpose.

(2) Out of the residue of the fund, the mortgagee may at any time retain sufficient funds to complete the improvement, according to the original plans, specifications, and contracts, and within the original contract price.

(3) The mortgagee may from time to time pay out on the owner's order, directly to the original contractor or subcontractor, or directly to the owner if the owner is the owner's own contractor, such sums as the owner certifies to be necessary to meet and pay labor payrolls for the improvement.

(4) The mortgagee shall pay on the order of the owner, the accounts of the material suppliers and laborers who have filed with the mortgagee a written notice as provided in this section, the amounts due for labor or work then performed and material then furnished for the improvement; and shall retain out of the mortgage fund such money to become due as is shown by the notice served and shall hold such money, and shall pay on the order of the owner, the amounts due to such persons who have served such notices, if the mortgagee has sufficient money in the mortgagee's hands to do so and also to complete the improvement; but if the mortgagee has funds in the mortgagee's hands insufficient to pay all such laborers and material suppliers in full and to complete the improvement, the mortgagee shall retain sufficient money to complete the improvement and to distribute the balance pro rata among the material suppliers and laborers who have filed such notices.

(5) If the owner refuses to issue an order to pay the amount of the notice filed, the mortgagee shall retain the whole amount claimed until the proper amount has been agreed upon or judicially determined provided that the mortgagee may withhold sufficient funds to complete the improvement.

(6) The mortgagee shall pay out on the owner's order, directly to material suppliers or laborers who have performed labor or work or furnished material for the improvement.

(7) The mortgagee shall pay the balance of the mortgage fund after the improvement is completed to the owner, or to whomsoever the owner directs.

In case the mortgagee pays out the fund otherwise than as provided in this section, then the lien of the mortgage to the extent that the funds had been otherwise paid, is subsequent to liens of original contractors, subcontractors, material suppliers, and laborers; but in no case is such a mortgagee obligated to pay or liable at law for more than the principal of the mortgage.

**{¶58}** Panzica argues that the only evidence presented that the loan proceeds were paid out in the manner described by the statute comes from the affidavit testimony of Steven L. Craig, president of Eureka Reality Partners Inc., a company that manages Garfield Hope, and the documents attached thereto. Panzica asserts that this affidavit testimony is inadmissible evidence because it does not establish that Craig had personal knowledge of how the loan disbursements were made while Huntington still owned the note and mortgage. We disagree with Panzica's contention that the affidavit testimony is inadmissible because we find that Craig has provided sufficient evidence of his personal knowledge of the business records, but agree that Craig has not presented sufficient evidence of proper payment.

**{¶59}** Craig's affidavit attests that the affidavit was based upon his review of Garfield Hope's records relating to the loan, including the historic records of Garfield Hope's predecessor in interest, Huntington, and from his personal knowledge of how those records are kept and maintained. Thus, Craig's affidavit is enough to establish that

he has personal knowledge of the loan documentation and how the payments were disbursed. *See* Civ.R. 56(E) (an affidavit must be made on personal knowledge of the facts). Panzica had the burden of establishing a lack of personal knowledge, despite the averment. *Id.* (stating "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Panzica has not presented evidence, other than mere speculation, that Craig does not or could not have personal knowledge of these facts. Panzica has failed to create a genuine issue of material fact on this point.

{¶60} However, we find that the affidavit does not establish whether the loan proceeds were paid out in accordance with the statute and therefore Garfield Hope is not entitled to judgment as a matter of law. While Craig avers that Huntington advanced funds to Bridgeview in accordance with the terms of the mortgage and that "said funds were advanced to fund improvements on the property and were, in fact, used to pay for improvements on the property" — this statement is not sufficient to establish that the loan proceeds were paid out in accordance with R.C. 1311.14(B) (1)-(7).

{¶61} At least six of the seven subsections of R.C. 1311.14(B) concern the disbursement of loan proceeds for the purpose of paying for improvements on property described in a construction mortgage. Craig has failed to indicate under which section, if any, the loan disbursements were paid or retained. These facts are essential to knowing

whether Huntington had a construction mortgage on the property described in each mortgage modification. *See* 1311.14(B) ("In case the mortgagee pays out the funds otherwise than as provided in this section, then the lien of the mortgage to the extent that the funds had been otherwise paid, is subsequent to liens of original contractors."). Therefore, upon remand, Garfield Hope must present sufficient evidence that loan disbursements were properly paid in accordance with the construction mortgage statute in order for Garfield Hope to have superior priority as to the mortgage modifications. In the event that Garfield Hope is unable to establish the construction mortgage status of its mortgage modifications, the court will still have to determine how two separate priority dates affect Panzica's lien claims over property described in the mortgage modifications.

### Priority Dates of Mechanic's Lien

{¶62} There are two priority dates that govern Panzica's mechanic's lien. When a project notice of commencement is not recorded, a mechanic's lien is effective as of the date of its first visible work. R.C. 1311.13(A)(1). Work performed after a notice of commencement is recorded renders the mechanic's lien effective as of the recording date of the notice of commencement. R.C. 1311.13(A)(2). A lien for work performed both prior to and after the recording of the notice of commencement has two effective dates: the portion of the lien that arises from work furnished prior to the recording of the notice of commencement has the effective date of the first visible work, while the portion of the lien that arises from work furnished after the recording of the notice of commencement is effective as of the recording date of the notice of commencement. R.C. 1311.13(B)(1).

{¶63} December 12, 2006, was Panzica's first date of visible work on the project. Bridgeview did not record its notice of commencement until October 3, 2007. Thus, pursuant to R.C. 1311.13, Panzica's lien has two effective dates: (1) December 12, 2006, for work performed from that date until the recording of the notice of commencement; and (2) October 3, 2007, for work performed from that date until work was ultimately concluded on October 21, 2008. On remand, the trial court will have to determine how these two dates affect Panzica's lien rights over the property described in the mortgage modifications.[17]

## Conclusion

{¶64} In conclusion, we restate the following determinations: 1) a genuine issue of material fact remains regarding the validity of Panzica's mechanic's lien due to certain lien waivers it executed; 2) Panzica was not required to record a notice of furnishing in order to preserve its lien rights; 3) Garfield Hope's mortgage modifications do not relate back to the date of the recording of the original mortgage; 4) the mortgage modifications contain the R.C. 1311.14 construction mortgage covenant by reference to the original mortgage, but a genuine issue of material fact remains as to whether the mortgage proceeds were paid out according to the construction mortgage statute; and 5) in the event that Garfield Hope cannot establish its loan disbursements conformed with the requirements of R.C. 1311.14(B), the court must determine how, if at all, Panzica's two

---

[17] Our review of the record establishes many of the mortgage modifications adding real property to the project occurred prior to the filing of the notice of commencement.

different priority dates affect its lien rights against the property contained in the mortgage modifications.

**{¶65}** We therefore reverse the grant of summary judgment in favor of Panzica and affirm the denial of Garfield Hope's motion for summary judgment. This cause is remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure

_____
MELODY J. STEWART, JUDGE

EILEEN A. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR